UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IAN DAUTEUIL, Derivatively on Behalf of QUIDELORTHO CORPORATION f/k/a QUIDEL CORPORATION,

Plaintiff,

v.

DOUGLAS C. BRYANT, JOSEPH M. BUSKY, RANDALL J. STEWARD, KENNETH F. BUECHLER, EVELYN S. DILSAVER, EDWARD L. MICHAEL, MARY LAKE POLAN, JAMES R. PRUTOW, ANN D. RHOADS, ROBERT R. SCHMIDT, MATTHEW W. STROBECK, KENNETH J. WIDDER, JOSEPH D. WILKINS, JR., CHRISTOPHER M. SMITH, and STEPHEN H. WISE,

Individual Defendants,

-and-

QUIDELORTHO CORPORATION f/k/a QUIDEL CORPORATION, a Delaware Corporation,

Nominal Defendant.

Case No.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Ian Dauteuil ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant QuidelOrtho Corporation, f/k/a Quidel Corporation ("**QuidelOrtho**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint against individual defendants Douglas C. Bryant, Joseph M. Busky, Randall J. Steward, Kenneth F. Buechler, Evelyn S. Dilsaver, Edward L. Michael, Mary Lake Polan, James R. Prutow, Ann D. Rhoads, Robert R. Schmidt, Matthew W. Strobeck, Kenneth J. Widder, Joseph D. Wilkins, Jr., , Christopher M. Smith, and Stephen H. Wise (collectively, the "**Individual Defendants**") for their breaches of

fiduciary duty as directors and/or officers of QuidelOrtho, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of documents produced to Plaintiff by QuidelOrtho (the "**Company Production**") in response to a books and records inspection demand made pursuant to 8 *Del. C.* § 220 ("**Section 220**" or "**Section 220 Demand**"), public filings with the U.S. Securities and Exchange Commission ("**SEC**"), and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant QuidelOrtho against members of its board of directors (the "**Board**") and members of the Company's upper management including C-suite members. The wrongdoing alleged herein substantially damaged QuidelOrtho's reputation, goodwill, and standing in the business community. It also exposed QuidelOrtho to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged QuidelOrtho in the form of, among other things, more than $1.4 billion of lost market capitalization. This action seeks to remedy wrongdoing committed by QuidelOrtho's directors and officers from February 17, 2022 through April 2, 2024 (the "**Relevant Period**").

2. QuidelOrtho provides tests to detect and diagnose various respiratory diseases and other medical conditions. QuidelOrtho manufactures respiratory tests under various brands,

including QuickVue, Sofia, and Savanna. The Company's respiratory business was historically tied to the sale of seasonal flu detection tests. After the beginning of the COVID-19 pandemic, the Company began to generate a significant portion of its revenue through the sales of COVID-19 tests to government customers, healthcare providers (through its authorized distributors), and retail pharmacy chains.

3. In December 2021, the Company announced that it agreed to merge with Ortho Clinical Diagnostics Holdings plc ("**Ortho**"). The transaction was valued at approximately $6 billion and was completed in May 2022, soon after the start of the Relevant Period. During that time, the COVID-19 pandemic transitioned to "endemic" status (i.e., COVID-19 infections no longer growing exponentially). Despite the transition from pandemic to an endemic status, the Individual Defendants assured investors that the Company's respiratory business remained well positioned to maintain stable, high margin revenues.

4. Among other strategies, the Company aimed to launch its "next flagship product," a new test called the Savanna Respiratory Viral Panel-4 (the "**Savanna RVP4 Test**"), which tests for COVID-19, influenza, and RSV from a single sample and which the Individual Defendants touted as a key driver of the $75 million in revenue synergies expected from the Ortho merger. The Savanna RVP4 Test was not approved by the U.S. Food and Drug Administration ("**FDA**") for marketing or sale during the Relevant Period. Thus, investors closely monitored the Company's progress in getting the Savanna RVP4 Test approved.

5. Throughout the Relevant Period, Defendants misled investors by making false and misleading statements that they knew or deliberately disregarded and failed to disclose the following adverse facts about QuidelOrtho's business, operations, and prospects: (a) that the Savanna RVP4 Test suffered from fundamental design and manufacturing flaws, failed in the field

in Europe at alarming rates, generated widespread customer complaints, and fell short of the 95% sensitivity required for FDA clearance; (b) that the Company could not manufacture the Savanna RVP4 Test at scale, having failed to bring an automated production line online despite investing at least $100 million; (c) that the Company's COVID-19 tests were rapidly losing market share to competitors, its Sofia platform faced end-of-life concerns, COVID-19 sales quotas were being missed throughout 2023, and excess and obsolete inventory was mounting; (d) that, as a result, there was no reasonable basis for the Company's guidance of $200 million to $400 million in annual endemic COVID-19 revenue beyond 2023, which the Individual Defendants had raised in December 2022; and (e) that, as a result of the above, the Individual Defendants lacked a reasonable basis for their positive statements about QuidelOrtho's business, financials, and growth trajectory.

6. These undisclosed issues began to emerge on February 13, 2024, when the Company reported disappointing results for its fourth quarter ended December 31, 2023. Among other things, the Company's Adjusted Earnings Per Share ("**Adjusted EPS**") was **46 percent below** the midpoint of Wall Street analysts' expectations. These results were largely due to lower endemic COVID-19 revenue during the quarter due to distributor destocking. The Company also slashed its 2024 financial forecasts, including a drastic cut to its COVID-19 revenue guidance. Specifically, QuidelOrtho lowered its annual endemic COVID-19 revenue forecast from the range of $200-$400 million to $200 million. During the related earnings call that day, Defendant Douglas Bryant continued to mislead investors about the prospects of the U.S. marketing approval for the Savanna RVP4 Test. Specifically, he stated, "the status of the submission of the 510(k) is on track from my previous comments. Recall that I had said that we expect to get clearance before the end of the first quarter. I think we're still on track for all that."

7. Analysts were surprised by the poor results and the weak projections. For example, Craig-Hallum analyst Alexander Nowak stated that "Q4 came in as one of the most surprising results we have seen in diagnostics in some time." Similarly, Raymond James analyst Andrew Cooper downgraded his rating on QuidelOrtho stock noting the Individual Defendants' "fairly deplorable communication and expectation setting both over the course of 2023 and even as recently as [January 2024]." On this news, the price of QuidelOrtho stock declined more than 32 percent, or $21.50, to close at $45.27 on February 14, 2024.

8. On February 21, 2024, the Company announced that the Board had terminated Defendant Douglas Bryant from his positions as President and Chief Executive Officer ("**CEO**") and that he had resigned from the Board. According to William Blair analyst Andrew Brackmann, "following last week's 2024 guidance debacle and the ensuing calls from many investors advocating for a change in management, we understand why the [B]oard made this move."

9. On March 4, 2024, UBS downgraded QuidelOrtho stock to Sell, reporting that the Company was experiencing sharper declines in COVID-19 revenue than its peers, undercutting the Individual Defendants' attribution of the Company's poor results to market-wide declines in COVID-19 testing. QuidelOrtho's stock fell over the following two trading days to close at $42.94 on March 5, 2024.

10. On April 2, 2024, the Company announced it withdrew its FDA 510(k) submission for approval to sell the Savanna RVP4 Test in the United States after recent data did not meet expectations. According to Citi analyst Patrick Donnelly, the Savanna RVP4 Test was "expected to be a key driver of Savanna uptake in the respiratory season." On this news, the price of QuidelOrtho stock dropped more than 10 percent, or $4.85, to close at $42.15 on April 2, 2024. The fallout continued after the Relevant Period: in May 2024, the Company again cut its endemic

COVID-19 revenue guidance, to $150 million, and disclosed that Savanna revenue would be immaterial in 2024; in July 2024, the Company fired Robert J. Bujarski and Michael Iskra, who had served as Interim President and Interim CEO, respectively, following Defendant Bryant's termination; and in November 2024, the Company disclosed that it did not expect the Savanna RVP4 Test to enter the U.S. market until the later part of 2025.

11. As detailed herein, and as alleged in the ongoing federal securities class action in the Southern District of New York captioned *In re QuidelOrtho Corporation Securities Litigation*, Case No. 1:24-cv-02804 (JAV) (the "**Securities Class Action**"), QuidelOrtho's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts. On September 30, 2026, the court in the Securities Class Action granted in part and denied in part the defendants' motion to dismiss, ECF No. 76 (S.D.N.Y. Sept. 30, 2026) ("**MTD Order**"), holding that the class plaintiff adequately alleged that the Company and its senior officers, including Defendants Bryant and Busky, made materially false and misleading statements about the Savanna RVP4 Test and the Company's endemic COVID-19 revenue with scienter, and allowing the Section 10(b) and 20(a) claims to proceed.

12. Through this derivative action, Plaintiff seeks to recover damages to QuidelOrtho caused by the misconduct alleged herein and all equitable and monetary relief from the Individual Defendants who violated their fiduciary duties in furtherance of their personal interests.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

17. This Court has personal jurisdiction over each defendant named herein. Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), authorizes nationwide service of process, and this Court has pendent personal jurisdiction over Plaintiff's state law claims, which arise from the same common nucleus of operative fact as the federal claims.

18. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## THE PARTIES

### Plaintiff

19. Plaintiff Ian Dauteuil is and has continuously been a stockholder of QuidelOrtho during the wrongdoing complained of herein. Plaintiff acquired 67 shares on December 28, 2021 and has held them continuously since then.

### Nominal Defendant

20. Defendant QuidelOrtho is a Delaware corporation with its principal executive offices located at 9975 Summers Ridge Road, San Diego, California, 92121. QuidelOrtho's shares trade on the Nasdaq Global Select Market ("**NASDAQ**") under the ticker symbol "QDEL."

**Individual Defendants**

21. Defendant Douglas C. Bryant ("**Bryant**") served as the Company's CEO, and director from March 2009 until the Board of Directors fired him in February 2024. Defendant Bryant resigned from the Board effective February 21, 2024. He had served as the Company's President from 2009 to May 2022 and again from December 2022 until February 2024, and served as Chair of the Board from May 2022 to December 2022. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, Defendant Bryant was reported to receive $6,757,143 in total compensation from the Company. For the 2022 fiscal year, he was reported to receive $12,885,604 in total compensation from the Company.

22. Defendant Joseph M. Busky ("**Busky**") served as the Company's Chief Financial Officer ("**CFO**") from May 2022 until July 2026; he has since served as a special advisor to the Company. He previously served as CFO of Ortho from July 2020 to May 2022. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, Defendant Busky was reported to receive $2,943,018 in total compensation from the Company. For the 2022 fiscal year, he was reported to receive $3,255,396 in total compensation from the Company.

23. Defendant Randall J. Steward ("**Steward**") served as the Company's CFO until May 2022, and served as a special advisor to the Company relating to its merger with Ortho, the CFO transition, and other matters between May 2022 and March 2024. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, Defendant Steward was reported to receive $3,157,747 in total compensation from the Company.

24. Defendant Kenneth F. Buechler ("**Buechler**") has served as a Company director since 2007. He has served as Chair of the Board since December 2022, and previously from August

2015 to May 2022. He previously served as the Lead Independent Director from May 2022 to December 2022. He is also the Chair of the Science and Technology Committee, and is a member of the Nominating and Corporate Governance Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, Defendant Buechler was reported to receive $411,497 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, Defendant Buechler was reported to receive $379,620 in total compensation from the Company. On February 17, 2023, two days after the Company's February 15, 2023 earnings call, Buechler exercised options to acquire 8,081 shares of QuidelOrtho common stock at $23.70 per share and sold all 8,081 shares the same day at $90.26 per share, for proceeds of approximately $729,366, while in possession of material non-public information ("**MNPI**"). *See* Statement of Changes in Beneficial Ownership (Form 4) of Kenneth F. Buechler (filed Feb. 22, 2023).

25. Defendant Evelyn S. Dilsaver ("**Dilsaver**") has served as a Company director since 2022. She is also a member of the Audit Committee. She was previously a director of Ortho until May 2022 where she was also Chair of its Audit Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, she was reported to receive $286,953 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, she was reported to receive $249,831 in total compensation from the Company.

26. Defendant Edward L. Michael ("**Michael**") has served as a Company director since 2018. He is also Chair of the Compensation Committee, and is a member of the Science and Technology Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, he was reported to receive $326,942 in total compensation from

the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, he was reported to receive $312,793 in total compensation from the Company.

27. Defendant Mary Lake Polan ("**Polan**") has served as a Company director since 1993. She is also a member of the Compensation Committee and the Science and Technology Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, she was reported to receive $300,945 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, she was reported to receive $289,655 in total compensation from the Company.

28. Defendant James R. Prutow ("**Prutow**") served as a Company director from November 28, 2023 until November 21, 2024. He was a member of the Nominating and Corporate Governance Committee and the Science and Technology Committee. He is an Operating Executive of the Carlyle Group, which was the Company's largest shareholder until it sold its remaining QuidelOrtho shares in November 2024. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, he was reported to receive $110,833 in total compensation from the Company.

29. Defendant Ann D. Rhoads ("**Rhoads**") has served as a Company director since 2020. She is also Chair of the Audit Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, she was reported to receive $314,473 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, she was reported to receive $301,940 in total compensation from the Company.

30. Defendant Robert R. Schmidt ("**Schmidt**") served as a Company director from May 2022 until November 21, 2024. He is a Managing Director of the Carlyle Group and has been involved with the Carlyle Group since 2011. He was a member of the Compensation Committee. He was previously a director of Ortho until May 2022 where he was also a member of the Compensation Committee and Executive Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, the Company paid $70,000 to the Carlyle Group for his Board service. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, the Company paid $52,500 to the Carlyle Group for his Board service.

31. Defendant Matthew W. Strobeck ("**Strobeck**") served as a Company director from 2018 until June 2026. During the Relevant Period, he was a member of the Audit Committee and the Science and Technology Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, he was reported to receive $280,000 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, he was reported to receive $268,736 in total compensation from the Company.

32. Defendant Kenneth J. Widder ("**Widder**") has served as a Company director since 2014. He is Chair of the Nominating and Corporate Governance Committee and a member of the Science and Technology Committee, and he served on the Audit Committee during the Relevant Period. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, he was reported to receive $320,465 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, he was reported to receive $306,559 in total compensation from the Company.

33. Defendant Joseph D. Wilkins, Jr. ("**Wilkins**") has served as a Company director since 2021. He is also a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, he was reported to receive $280,000 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, he was reported to receive $268,736 in total compensation from the Company.

34. Defendant Christopher M. Smith ("**Smith**") served as a Company director from May 2022 until August 2023. From September 2019 to May 2022, he served as Ortho's CEO and Chair of its Board of Directors. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, he was reported to receive $35,000 in total compensation from the Company. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, he was reported to receive $249,831 in total compensation from the Company.

35. Defendant Stephen H. Wise ("**Wise**") served as a Company director from May 2022 until November 2023. He was a member of the Company's Nominating and Corporate Governance Committee. During his Board tenure, he served as a Managing Director and Global Head of Healthcare at The Carlyle Group, and he is now a Partner and Co-Head of Americas Corporate Private Equity at The Carlyle Group. He has been involved with the firm since 2006. He was previously a director of Ortho until May 2022 where he was Chair of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee and Executive Committee. According to the Company's Proxy Statement filed with the SEC on April 2, 2024, for the 2023 fiscal year, the Company paid $58,334 to the Carlyle Group for his Board

service. According to the Company's Proxy Statement filed with the SEC on April 5, 2023, for the 2022 fiscal year, the Company paid $52,500 to the Carlyle Group for his Board service.

36. Together, Defendants Prutow, Schmidt, Strobeck, Smith, and Wise may be referred to herein as the "**Former Director Defendants**;" and Defendants Bryant, Busky, and Steward may be referred to herein as the "**Officer Defendants**."

37. The Individual Defendants, because of their positions with QuidelOrtho, possessed the power and authority to control the contents of QuidelOrtho's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to MNPI, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

38. QuidelOrtho manufactures and sells diagnostic healthcare products. The Company sells its products and services nationwide. Its products are sold through its network of authorized distributors and its direct sales force. The Company's customer groups include governmental health agencies, physician offices, hospitals, universities, retail health clinics, large pharmacy chains, and blood banks.

39. The Company's primary diagnostic products in the respiratory category are seasonal flu tests. Through the sale of COVID-19 detection tests since COVID-19 became a

pandemic in 2020, the Company's respiratory business began generating substantial revenue. The Individual Defendants have characterized revenue from the Company's respiratory tests as "high margin revenue." The Company manufactures its respiratory tests under various brands, including QuickVue, Sofia, and Savanna.

40. In December 2021, the Company announced that it agreed to merge with Ortho. The Individual Defendants stated that the merger would benefit legacy Quidel Corporation by expanding revenue through cross-selling opportunities. The Individual Defendants stated the merger would benefit the Company by creating cost synergies through supply chain optimization and shared administrative functions. The merger was completed in May 2022, shortly after the beginning of the Relevant Period.

41. During the Relevant Period, despite COVID-19 transitioning into an endemic phase, the Individual Defendants assured investors that QuidelOrtho was well positioned to maintain a stable high margin revenue stream from its respiratory business. QuidelOrtho highlighted sales of the Savanna RVP4 Test through Ortho's distribution network as a key strategy for its respiratory business. The Savanna RVP4 Test was not approved by the FDA to be marketed or sold in the United States during the Relevant Period. Thus, investors closely kept track of the Company's progress in getting the Savanna RVP4 Test approved.

**The Savanna RVP4 Test**

42. Quidel first unveiled its Savanna platform in 2011 and long marketed it as the Company's next flagship product, which Defendants described as "the most important product in [the C]ompany's history." The Savanna RVP4 Test, a multiplex assay designed to detect influenza A and B, COVID-19, and RSV from a single sample, received a European CE Mark on July 12, 2021, and Savanna was cited as an important strategic consideration supporting the Ortho merger,

which Defendants represented would generate $75 million in revenue synergies. Unknown to investors, however, the Savanna RVP4 Test was not ready for market when it launched in Europe, or at any point during the Relevant Period. Former employees of the Company[1] (including FE-2, the Company's Senior Director, Systems Engineering from February 2020 to September 2023, who oversaw engineering for the Company's new and existing instruments; FE-4, who held senior marketing roles from mid-2020 to Fall 2023 and led the RVP4 Test's European launch; and FE-10, a Finance Director from Fall 2020 to Fall 2023) described how the RVP4 Test could not generate reliable results and suffered from manufacturability and design issues, requiring the Company to scrap more than half of the tests produced, while many of the remaining tests that went to market were flawed and produced invalid results. *See* Amended Class Action Complaint ¶¶ 172–73, 176, 223–25 (FE-2, FE-4, FE-10); *see also* MTD Order at 9, 15–16.

43. These problems were known internally from the outset. According to FE-14, an engineer and Associate Director during the Relevant Period who worked on the RVP4 project until the second half of 2023, design flaws in the RVP4 Test were raised internally with the Company's Senior Vice President of Research and Development, Werner Kroll, as early as 2019. Rather than address them, in 2020 Kroll, Defendant Steward, and then-Chief Operating Officer Robert J. Bujarski decided to "dismantle" the large engineering team working on the RVP4 Test and transfer the project to a small, "insular" team that did not share information across the Company, in order to "push" the product to production. The Executive Steering Committee for the Savanna project (consisting of Kroll, Defendant Steward, and Bujarski, and overseen by Defendant Bryant) favored cutting corners, including skipping reliability testing because the RVP4 instrument and cartridge

[1] Former employees of the Company ("**FEs**") are identified herein by the numbering used in the operative amended complaint in the Securities Class Action, ECF No. 42 (the "**Amended Class Action Complaint**"). *See* Amended Class Action Complaint ¶¶ 46–66; MTD Order at 4 n.1.

would break and fail. According to FE-14, the project was pushed forward despite these known flaws because C-suite bonuses were tied to Savanna launch targets, and FE-13, a Cost Accountant from February 2022 to March 2023, recalled a Company finance manager stating that Savanna needed to "get out the door" because C-suite bonuses depended on its launch. *See* Amended Class Action Complaint ¶¶ 133–36, 381; MTD Order at 8, 20, 77.

44. Contrary to the Individual Defendants' repeated public reports of positive European customer feedback, the European launch was limited (approximately 40 analyzers sold to a few customers in Austria, Germany, and Italy in late 2021 and early 2022, and only another 40 to 50 in 2023) and was beset by complaints from the start. FE-4 and FE-7, the Company's Marketing Manager, Molecular Dx (EMEA) from March 2021 to May 2024, described consistent complaints about devices breaking down and tests generating an alarming rate of "invalid" results; approximately 25% of the devices and another 25% of the tests failed in the field and had to be replaced at the Company's cost, and European customers were described as "irate." *See* Amended Class Action Complaint ¶¶ 171–76; MTD Order at 9. A quarterly report presented on a 2023 internal call reflected approximately 85 customer complaints for the roughly 80 devices then in the market, more complaints than devices, and FE-7 stated that in a 20-year career he "didn't remember any market launch that was so full of issues." Each complaint was recorded and reported up to the C-suite. *See id.* at ¶¶ 170–73, 183–88, 190; MTD Order at 8–12.

45. The problems were serious enough to trigger a formal internal investigation. Savanna RVP4 customer complaints in August 2023 were graded "Red" on the Company's complaint scorecard, and after a field investigation confirmed the RVP4 error codes, the Company opened a Corrective and Preventive Action ("**CAPA**") investigation in Summer 2023 to identify

the root cause. The Company never disclosed the CAPA investigation to investors. *See* MTD Order at 77.

46. The Company also knew the RVP4 Test could not meet FDA requirements. Unlike the European CE Mark, which amounted essentially to self-certification, U.S. sales required FDA clearance, and the FDA communicated to the Company well before its submission that the RVP4 Test needed to consistently demonstrate 95% sensitivity for the targeted viral infections. The Company's internal testing never achieved that level, and Savanna was not passing the Company's internal qualifications or testing in 2022 and early 2023. Nonetheless, around the end of July 2023, the Company applied for FDA clearance. According to FE-4, the person responsible for validating the RVP4 test results for the FDA submission stated at the time that the RVP4 Test "does not work" and "isn't even a product"; FE-1, the Company's Senior Director, Regulatory Affairs from January 2020 to April 2024, understood that the Company knew it was not meeting the FDA's requirements when it submitted its 510(k) application but went ahead anyway; and, according to FE-10, employees internally joked that the product was the Company's "Theranos." *See* Amended Class Action Complaint ¶¶ 196, 198, 204, 206; MTD Order at 14, 56–57, 61. A clinical study published in July 2024 later found that the RVP4 Test's average sensitivity fell short of 95% for COVID-19 and influenza A, and that it produced invalid results at a rate of 9.9%, compared to 0.7% for a competitor's test.

47. Nor could the Company manufacture the RVP4 Test at scale. The ability to automate RVP4 production was essential to realizing any profit on the product and to achieving the $75 million in merger revenue synergies Defendants promised by 2025. Yet despite investing at least $100 million in an automated production line for RVP4 cartridges, the Company still had no such line by the end of 2023.

**The Company's COVID-19 Business**

48. Meanwhile, the Company's COVID-19 business was in steep decline. By the end of 2022, the Company's COVID-19 test products were rapidly losing market share to competitors offering newer and more accurate molecular tests and greater reimbursement opportunities, leading to what FE-3, a sales and business development employee through April 2024, described as "grossly declining" revenues. *See* Amended Class Action Complaint ¶¶ 48, 236, 252; MTD Order at 65. According to FE-11, a Channel Sales Manager from February 2023 to July 2024 who worked with the Company's distributors in the Mid-Atlantic and Northeast, major distributors, including Cardinal Health, McKesson, and Henry Schein, stopped ordering COVID-19 tests from the Company – in Cardinal Health's case because bulk orders of at-home test kits had never moved out of its distribution warehouses. *See* Amended Class Action Complaint ¶ 233; MTD Order at 68.

49. At the same time, the Company's dominant Sofia point-of-care platform, whose analyzers and related tests contributed approximately $1.1 billion of the Company's $1.66 billion in revenues in 2020, faced critical "end-of-life" concerns by no later than mid-2023, with its primary manufacturer ceasing production of key components. Amended Class Action Complaint ¶¶ 74, 138–41. Two other diagnostic instrument development projects that had been held out as future growth drivers failed and were scrapped in 2023.

50. Former sales employees confirmed the collapse. Between late Fall 2022 and early Spring 2023, 30 to 40% of the customers of FE-15, a Territory Manager for California and Nevada from March 2019 to June 2023, stopped purchasing COVID-19 tests from the Company, reporting that they were buying newer tests from competitors. *See* Amended Class Action Complaint ¶¶ 60, 241; MTD Order at 65. According to FE-16, an Account Manager in the Northeast from late 2022 through September 2023, COVID-19 test sales to hospitals were "completely gone" in 2023, and

the Company's acute business "disappeared overnight." The Company resorted to providing free COVID-19 demo kits and heavily discounted tests because of the "urgency" to sell them in the fourth quarter of 2022 and the first quarter of 2023. *See id.* at ¶¶ 61, 244–45; MTD Order at 65, 68.

51. These trends were reported to senior management. Throughout 2023, according to FE-19, who oversaw the Company's Inside Sales Team from January 2023 to April 2024, most sales representatives missed their respiratory sales quotas, some "by a mile." See Amended Class Action Complaint ¶¶ 64, 258; MTD Order at 65. The inflated 2023 sales quotas were identified at the start of the year and brought to the attention of senior management, including the Individual Defendants. Quota-attainment data maintained in the Company's Microsoft Power BI system, accessible to the C-suite, showed the "huge decline" in the business "easily and obviously," according to FE-3. *See* Amended Class Action Complaint ¶ 257. Sales leadership reported to Defendant Busky at the end of each quarter in 2023 that the Company was not going to hit its respiratory sales quotas.

52. Inventory mounted as sales fell. COVID-19 test inventory piled up with distributors who had no need for the expiring products, and, according to FE-10, the number of expiring tests reviewed at the Company's quarterly Excess and Obsolete ("**E&O**") meetings increased every quarter, with participants remarking at each meeting, "wow, this is the most E&O I remember us having." *See* Amended Class Action Complaint ¶¶ 233, 245, 272–74, 349; MTD Order at 65. According to FE-10, the Company's internal inventory report (the "**McKellar Report**") reflected that "nothing is selling" and that inventory levels were going "up, up, up." *See* Amended Class Action Complaint ¶¶ 55, 276; MTD Order at 72. Analyses of expiring product were relayed to, and discussed directly with, Defendant Busky, who received a monthly in-person analysis of the

Company's significant inventory risk and regular reports assessing the financial risk that excess inventory posed to the Company. *See* Amended Class Action Complaint ¶¶ 20, 276–78; MTD Order at 72.

53. Despite these facts, Defendants doubled the Company's endemic COVID-19 revenue guidance. From August 2022 until nearly the end of 2022, Defendants Bryant and Busky told investors that endemic COVID-19 revenue would be $150 million to $200 million per year. After QuidelOrtho's stock fell more than 17 percent following its December 13, 2022 Investor Day, Defendant Busky held a series of calls with analysts and, within days, raised the endemic COVID-19 revenue guidance to $200 million to $400 million (doubling the upper end of the prior range), which the Individual Defendants repeated throughout 2023 while the Company's actual outlook for COVID-19 sales worsened.

54. [redacted]

55. [redacted]

[redacted]

**<u>The Individual Defendants' False and Misleading Statements</u>**

56. Throughout the Relevant Period, the Individual Defendants repeatedly touted the success of the Savanna RVP4 Test's European launch, its imminent FDA approval, and the Company's ability to manufacture it at scale. For example, on February 17, 2022, Defendant

Bryant stated that "[b]ased on customer reviews in Europe, we believe Savanna will be a major growth driver, both in the U.S. and globally, for years to come." On March 9, 2022, he described Savanna as "performing very nicely in Europe right now. We're hearing really nice feedback." On February 15, 2023, Defendant Busky stated that "Savanna sales in Europe are expected to drive strong growth within our Molecular Diagnostics business," and Defendant Bryant stated: "We're still expecting RVP for EUA in April and the 510(k) will be just shortly after that. So, we're very much on track for the launch. As I said, the instrument build issues have been largely resolved… [W]e expect to have the ability to make millions of cartridges very shortly." The court in the Securities Class Action declined to dismiss each of these statements. MTD Order at 40–45, 51–52, 56.

57. The Company's periodic SEC filings and accompanying SOX certifications described below are alleged herein not as independently false statements, but because they omitted the adverse facts described above and because their cautionary risk disclosures warned of risks, such as market share loss and obsolescence, that had already materialized when the filings were made. See MTD Order at 70–71.

58. On February 17, 2022, the Company issued a press release announcing its financial results for its fiscal quarter and year ended December 31, 2021. The Company reported $511.8 million in quarterly revenue for COVID-19 products, versus $405.3 million in its fourth quarter of 2020. Citing the upcoming merger, management declined to provide guidance for 2022.

59. On an earnings call held after the close of trading on February 17, 2022 to discuss the financial results, Defendant Bryant touted the "strong demand for COVID-19 rapid immunoassay products for both Sofia and QuickVue." Defendant Bryant also stated:

> In January, **we saw incredibly strong demand for our Sofia COVID-19 antigen test in the professional market as well as**

> **demand for our QuickVue At-Home product as a result of elevated COVID-19 case counts.** As we move closer to the end of February, we are seeing demand moderate in the professional and retail markets commensurate with lower COVID-19 positive cases but bolstered by the continued fulfillment of state and U.S. government orders as COVID-19 shifts from a pandemic to what some scientists anticipate as an endemic phase.

60. On February 18, 2022, the Company filed its Form 10-K with the SEC reporting financial results for the year ended December 31, 2021 (the "**2021 10-K**") which included the following risk factor:

> **Our operating results are heavily dependent on sales of our COVID-19 and influenza diagnostic tests and if sales or revenues of our COVID-19 or influenza tests decline for any reason, our operating results would be materially and adversely affected.**
>
> A significant percentage of our total revenues come from a limited number of our product families. In particular, revenues from the sale of our COVID-19 and influenza tests represent a significant portion of our total revenues and are expected to remain so for at least the near future. For the years ended December 31, 2021, 2020 and 2019, sales of our COVID-19 products accounted for 75%, 70% and 0% and influenza products accounted for 4%, 8%, and 26%, respectively, of total revenue. In addition, the gross margins derived from sales of our COVID-19 and influenza tests are significantly higher than the gross margins from many of our other core products. As a result, if sales or revenues of our COVID-19 or influenza tests decline for any reason, whether as a result of a waning of the COVID-19 pandemic, a mild flu season, market share loss or price pressure, obsolescence, regulatory matters, such as loss of EUAs for our COVID-19 products, or any other reason, our operating results would be materially and adversely affected on a disproportionate basis.

61. On March 11, 2022, the Company filed a Form 10-K/A amending the 2021 10-K ("**2021 10-K Amendment**"). The 2021 10-K Amendment contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("**SOX**") by Defendant Bryant and Defendant Steward. They certified that "[t]he [2021 10-K Amendment] does not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

62. On May 4, 2022, the Company issued a press release announcing its financial results for its fiscal quarter ended March 31, 2022. The Company reported $836.1 million in quarterly revenue for COVID-19 products, versus $269.1 million in its first fiscal quarter of 2021. Citing the upcoming merger, management declined to provide guidance for 2022.

63. On an earnings call held that same day, Defendant Bryant stated, "consistent with the anticipated shift in COVID-19 testing demand, we continue to bolster our resilience in the post-pandemic future by accelerating assay development and production and further expanding our footprint at the point of care." Defendant Bryant continued:

> Total rapid immunoassay revenue increased by $655 million in the first quarter '22 to $893 million. **We saw significant sales of QuickVue At-Home OTC COVID-19 tests. And while COVID-19 testing made up the bulk of this heightened demand**, it's noteworthy that non-COVID sales grew 56%.

64. On May 5, 2022, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the quarter (the "**Q1 2022 10-Q**"). In the Q1 2022 10-Q, the Company claimed there had been "no material change to the risk factors as previously disclosed in [the 2021 10-K]."

65. Appended as an exhibit to the Q1 2022 10-Q was a signed SOX certification wherein Defendant Bryant and Defendant Steward certified that the information in the Q1 2022 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

66. On August 4, 2022, the Company issued a press release announcing its financial results for its second quarter ended July 3, 2022. The Company reported $298 million in quarterly revenue for COVID-19 products, versus $280.3 million in its second fiscal quarter of 2021.

67. On an earnings call on that same day Defendant Bryant stated, "In terms of the OTC space, we continue to strengthen our positioning through our QuickVue at-home OTC COVID-19 test." Additionally, Defendant Busky further assured investors that "we believe that the COVID revenue once it gets into endemic stage, as you move into next year, we'll be in that $150 million to $200 million range annual COVID revenue."

68. On August 5, 2022, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the quarter (the "**Q2 2022 10-Q**") which included the following risk factor:

> **Fluctuations or a decline in sales of our COVID-19 and influenza diagnostic tests can have a significant impact on our operating results and if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, our operating results could be materially and adversely affected.**
>
> A significant percentage of our total revenues come from a limited number of our product families. In particular, revenues from the sale of our COVID-19 tests have recently represented a significant portion of our total revenues. Sales of our COVID-19 products accounted for approximately 70% of our total revenue for the six months ended July 3, 2022. Demand for our COVID-19 testing products can fluctuate or decline as a result of a number of factors, including but not limited to the emergence and impact of new variants, the effectiveness of global containment efforts, and increased market supply of COVID-19 tests by our competitors. Similarly, demand for our influenza tests can fluctuate or decline based on the severity of the flu season. The gross margins derived from sales of our COVID-19 and influenza tests are significantly higher than the gross margins from many of our other core products. As a result, if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, whether as a result of a waning of the COVID-19 pandemic, a mild flu season, market share loss or price pressure, obsolescence, regulatory matters, such as loss of

> EUAs from the FDA for our COVID-19 products, or any other reason, our operating results would be materially and adversely affected on a disproportionate basis.

69. Appended as an exhibit to the Q2 2022 10-Q was a signed SOX certification wherein Defendant Bryant and Defendant Busky certified that the information in the Q2 2022 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

70. [redacted]

71. On November 2, 2022, the Company released its financial results for its third fiscal quarter ended October 2, 2022. The Company reported $171 million in quarterly revenue for COVID-19 products, versus $402.6 million in its third fiscal quarter of 2021.

72. On the Company's earnings call, Defendants Bryant and Busky further assured investors that endemic COVID-19 revenue would be in the $150 million to $200 million range annually. Defendant Busky further called the $150 million to $200 million range "conservative."

73. On November 4, 2022, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the quarter (the "**Q3 2022 10-Q**"). In the Q3 2022 10-Q, the Company claimed there had been "no material change in our risk factors as previously disclosed in [the Q2 2022 10-Q]."

74. Appended as an exhibit to the Q3 2022 10-Q was a signed SOX certification wherein Defendant Bryant and Defendant Busky certified that the information in the Q3 2022 10-

Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

75. [redacted]

76. On December 13, 2022, the Company hosted its 2022 Investor Day. During the 2022 Investor Day, Defendant Busky stated:

> The next item on the list again, it's investing back in the business, and this is more an operational excellence area. We will invest CapEx. We are investing. We will continue to invest CapEx into the business to increase the manufacturing capacity. I think Doug said this earlier, too, **we don't have so much of a demand problem right now. We have a supply problem. We got to get more products.**

77. [redacted]

78. On February 15, 2023, the Company released its financial results for its fourth fiscal quarter and year ended January 1, 2023. The Company reported $132 million in quarterly revenue for COVID-19 products, versus $511.8 million in its fourth fiscal quarter of 2021.

79. During the Company's related earnings call later that day, Defendant Busky stated:

> Going forward, although there may be spikes and no one really knows for sure, we assume COVID-19 transitions to an endemic state. Similar to other seasonal respiratory viruses and we plan to bucket it with those other respiratory viruses in '23 and forward. And while 2022 included a record-setting respiratory season, including flu and COVID-19, we expect '23 to return to a more

> normal respiratory season. **We expect to continue to capture and grow our share of the respiratory market, underpinned by our large and growing Sofia placements.**

80. On the same call, an analyst asked whether "there's the fear that, as COVID comes out, 2024 then takes a step down." Defendant Busky responded: "[T]here's really no change there with that endemic level of annual revenue being it's $200 million to $400 million, and you're right, it's up another $100 million in 2023 guide because of those government orders, which again, like as you said, doesn't carry super significant amount of margin."

81. On February 23, 2023, the Company filed with the SEC a Form 10-K reporting financial results for the year (the "**2022 10-K**") which included the following risk factor, which warned of risks such as "market share loss" and "obsolescence" that had already materialized:

> **Fluctuations or a decline in sales of our COVID-19 and influenza diagnostic tests can have a significant impact on our operating results and if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, our operating results could be materially and adversely affected.**
>
> A significant percentage of our total revenues is generated from a limited number of our product families. In particular, revenues from the sales of our COVID-19 tests have represented a significant portion of our total revenues. Sales of our COVID-19 products accounted for approximately 44% of our total revenues for the year ended January 1, 2023, which includes the impact of Ortho's operations from the date of the Combinations. Demand for our COVID-19 testing products has and may continue to fluctuate or decline as a result of a number of factors, including but not limited to the emergence and impact of new variants or resurgences, the effectiveness of global containment efforts, and the increased market supply of COVID-19 tests by our competitors. Sales of our influenza tests accounted for approximately 11% of our total revenues for the year ended January 1, 2023, which includes the impact of Ortho's operations from the date of the Combinations. Demand for our influenza tests can fluctuate or decline based on the severity of the flu season. The gross margins derived from sales of our COVID-19 and influenza tests are generally significantly higher than the gross margins from many of our other core products. As a result, if sales or revenues of our COVID-19 or influenza tests

> fluctuate or decline for any reason, whether as a result of a waning of the COVID-19 pandemic, a mild flu season, market share loss or price pressure, obsolescence, regulatory matters, such as loss of EUAs from the FDA for our COVID-19 products, or any other reason, our operating results would be materially and adversely affected on a disproportionate basis.

82. Appended as an exhibit to the 2022 10-K was a signed SOX certification wherein Defendant Bryant and Defendant Busky certified that the information in the 2022 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Company."

83. [redacted]

84. On March 7, 2023, the Company participated in the Raymond James Institutional Investors Conference. During the conference, an analyst asked Defendant Bryant about "the progression" of the Company's EBITDA expectations "in terms of COVID rolling off" and whether EBITDA for 2024 should "be higher than 2023, 2025 higher than 2024?" Defendant Bryant responded: "your comment about 2024 should be better than 2023 and 2025 better than 2024 I think is a reasonable expectation."

85. On May 3, 2023, the Company released its financial results for its fiscal quarter ended April 2, 2023. The Company reported $265.6 million in quarterly Respiratory revenues, versus $947.3 million in its first fiscal quarter of 2022. During the Company's related earnings call later that day, Defendant Bryant was asked about QuidelOrtho's endemic guidance:

> **Analyst Patrick Donnelly**: And then maybe just a quick one on the respiratory guide, basically put up a pretty nice beat this quarter, maintain the guide for the full year. Was that essentially, Joe, to your point about some pull forward of revs and then maybe wanting to derisk that second half ramp a little bit. There was quite a bit of focus

> on that post the guidance, as you know, so maybe just talk through how you approach that, given the results in the quarter.
>
> **Defendant Bryant**: Let me start and then Joe will provide for more detail. **But remember, in the endemic state, we had, assuming that we are now in that endemic state, we had forecasted that we would be doing $200 million to $400 million per year over the next few years, this year, next year and perhaps beyond. That was how we derisked the number.**
>
> The 300 to 500 was to take under account federal orders that we knew we had already on hand and assumed that there would be some level of shipment. So all of that was shipped in the first quarter, a small amount, I think a tiny amount, maybe $4 million or so, we shipped in April as well, and now we're done with the fed orders. right? So I think that, that coupled with the run rate that we had forecasted plus a little bit of pull forward on the retail segment.
>
> As a number of the retail – the large retailers actually had programs where patients would order product online, and then we go pick on that – pick the product off stores, that sort of offset. **So I think we're still very comfortable that moving forward will be in that 200 to 400 range for COVID. And this year, obviously, we're forecasting to be slightly higher.**

86. On May 4, 2023, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the quarter (the "**Q1 2023 10-Q**"). In the Q1 2023 10-Q, the Company claimed there had been "no material change in our risk factors as previously disclosed in [the 2022 10-K]." Appended as an exhibit to the Q1 2023 10-Q was a signed SOX certification wherein Defendant Bryant and Defendant Busky certified that the information in the Q1 2023 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

87. [redacted]

88. On August 8, 2023, the Company announced its financial results for its fiscal quarter ended July 2, 2023. The Company reported $89.0 million in quarterly Respiratory revenues, versus $339.1 million in its second fiscal quarter of 2022.

89. During the Company's earnings call on that same day, Defendant Bryant stated:

> Turning to our Point-of-Care business unit. Respiratory revenue declined, driven by a reduction in our retail business as expected, following the end of the COVID-19 public health emergency in May and the continued transition to an endemic state. With insurance companies no longer supporting free at-home COVID-19 tests including our QuickVue over-the-counter test, our overall COVID-19 business faced a challenging comp on a year-over-year basis.
>
> And as reported by several other diagnostic companies, the end of the public health emergency had a significant dampening effect on molecular COVID test volumes. **For us, this helped to drive double-digit year-over-year growth of our Point-of-Care COVID business as many customers shifted testing for symptomatic patients back to antigen tests and more specifically to our Sofia SARS Antigen assay.**

On the same call, Defendant Busky stated:

> We now expect full year gross margins to be at the low end of our prior expectations of low to mid-50s due to product mix, including higher instrument revenues from the faster-than-expected drilling on the labs instrument open orders. Adjusted EBITDA margin expected of 26.9% to 27.7% in the range of $800 million to $830 million compared to our prior guidance of $815 million to $865 million.
>
> **And despite the reduction in our guidance for higher-margin COVID-related revenue, we are offsetting the full P&L impact of the revenue drop with expense reductions.** Adjusted diluted EPS is now expected to be in the range of $4.85 to $5.30 compared to our prior guidance of $5.15 to $5.70.

90. On August 9, 2023, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the quarter (the "**Q2 2023 10-Q**"). In the Q2 2023 10-Q, the Company claimed there had been "no material change in our risk factors as previously disclosed in [the 2022 10-K]." Appended as an exhibit to the Q2 2023 10-Q was a signed SOX certification

wherein Defendants Bryant and Busky certified that the information in the Q2 2023 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

91. [redacted]

92. [redacted]

93. On September 12, 2023, the Company participated in the Morgan Stanley Global Healthcare Conference. During the conference, Defendant Bryant stated:

> What I would say for the back half total guide, though, that this certainly derisks what we said we would do for the back half in terms of respiratory disease testing for both COVID and Influenza. And then further, I would say, it supports the notion what's happening right now supports our assertion that COVID is just another respiratory virus and it is now endemic. **And we should expect, therefore, moving forward, 2024 and beyond, to see $200 million**

2 [redacted]

> **to $400 million in COVID-specific – or COVID-only sales.** And I would suggest that with the pending launch of the combination product in the OTC space that I think that product will be a winner for us. But – so your question was, are we going to change the guide, I don't think so. I think it's been derisked though.

94. Defendant Bryant was also asked about FDA approval for the Savanna RVP 4 Test:

> **Analyst Tejas Savant**: So – and what about sort of FDA submission and 510(k) for the instrument? And then I think you had the RVP4 and HSV panels. What are the timelines for that in terms of U.S. approval?
>
> **Defendant Bryant**: We submitted 510(k)'s at the end of July for HSV/VZV as well as respiratory panel. We've also submitted EUA for the respiratory panel. The 510(k)'s both are under active review at the FDA, meaning that they've accepted the package and actually are – have sent us several series of questions to talk about what's in the package of the data, et cetera. And we have not heard anything back on the EUA, which I would suggest means that the package for the 510(k) must be reasonably suitable because they're pursuing that rather aggressively with us. So I would also point to the fact that in the last month or so, we've had several the FDA clearances, for example, in lab business for CEA, CA 19-9 both of which are oncology markers. We've had approval for PTH, all were reviewed and cleared in a timely manner. **So it would suggest to me that the FDA is now pretty much back on track in terms of its cadence of review and approval. So I think that portends well for us.**

95. On November 1, 2023, the Company released its financial results for its fiscal quarter ended October 1, 2023. The Company reported $185.4 million in quarterly Respiratory revenues, versus $236.1 million in its third fiscal quarter of 2022.

During the Company's earnings call, Defendant Bryant stated that:

> **Both the overall market for respiratory testing and our respiratory business became significantly larger due to more testing in general, and significant share gains from competitors for us specifically. We have a strong position in this market and our respiratory diagnostic capabilities play an important role in combating both early and seasonal upticks of COVID-19, RSV and influenza, among others. We're also well positioned to manage any seasonal fluctuations, given our operations team's agility to respond to meet customer demand.**

96. Defendant Bryant was also asked about FDA approval for the Savanna RVP 4 Test:

> **Analyst Alexander Nowak**: And then so on Savanna, what has been the feedback so far at the FDA? And I'm sure they've had questions around the submission. And I've honestly forgotten, is this going to be a 510(k) or an EUA that we should get the approval at the end of this year?
>
> **Defendant Bryant**: Thanks for the question, Alex. We're super confident that we'll have approval for the box. And it will be approved by 510(k). We'll pursue CLIA waiver at our earliest opportunity. But it's not going to be in the EUA.
>
> **Analyst Alexander Nowak**: And that's 510(k) for the RVP 4 as well, just to confirm.
>
> **Defendant Bryant**: That's correct. **So RVP 4 would be cleared**, HSV obviously is under active review as well.
>
> **Analyst Alexander Nowak**: Okay. Perfect. And then just an update on the high-volume cartridge manufacturing line.
>
> **Defendant Bryant**: I don't have a further update. **We're still targeting everything on track for midyear next year.**

97. On November 2, 2023, the Company filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the quarter (the "**Q3 2023 10-Q**"). In the Q3 2023 10-Q, the Company claimed there had been "no material change in our risk factors as previously disclosed in [the 2022 10-K]." Appended as an exhibit to the Q3 2023 10-Q was a signed SOX certification wherein Defendants Bryant and Busky certified that the information in the Q3 2023 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

98. [redacted]

with the accompanying press release, during the October 30, 2023 Audit Committee Meeting. *See* QUIDEL_0000270–QUIDEL_0000271.

99. On November 30, 2023, the Company participated in the Evercore ISI HealthCONx Conference. During the conference, an analyst asked about the Company's "new baseline" for COVID assumptions and whether there were any "sensitivities." Defendant Bryant reaffirmed QuidelOrtho's $200 million to $400 million endemic COVID-19 revenue target for fiscal year 2024, stating: "Well, I don't know about sensitivities. I would say, our $200 million to $400 million, we still think is the right number. I think, for 2024, we probably will be higher than the midpoint for COVID still."

100. On January 8, 2024, the Company participated in the 42nd Annual JPMorgan Healthcare Conference. During the conference, in response to an analyst question regarding whether QuidelOrtho's target of $200 million to $400 million in COVID-related revenue was "applicable to 2024," Defendant Bryant stated: "I think we're very much on track for 2024." Asked about the Company's decision not to pre-announce its fourth quarter 2023 results, Defendant Bryant further stated that "we historically have preannounced when we have something that's materially different than you think," and "we didn't actually see a need to do that and we'll have plenty to talk about at the earnings call here in a few weeks."

101. On the same call, Defendant Bryant was asked about the status of the Savanna RVP4 Test:

> **Analyst Casey Woodring**: Doug, maybe in the last 2 minutes, we can talk about Savanna, exciting update a couple of weeks ago. Can you give us a sense of when we should expect the RVP4 panel, should that be approved during the respiratory season here? And just kind of any update on what you've heard from the agency or anything?

> **Defendant Bryant: Well, we're in good shape. And I would commit to being in market before the end of the quarter.**

**<u>The False and Misleading Proxy Statements</u>**

102. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements filed on April 11, 2022 (the "**2022 Proxy**"), April 5, 2023 (the "**2023 Proxy**"), and April 2, 2024 (the "**2024 Proxy**"). The 2022 Proxy, 2023 Proxy, and 2024 Proxy are collectively referred to herein as the "**Proxies**."

103. The 2022 Proxy, a joint proxy statement/prospectus issued in connection with the Ortho merger and Quidel's 2022 annual meeting of stockholders, solicited stockholder votes in favor of, among other things, the re-election of Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins, the approval, on an advisory basis, of the compensation of Quidel's named executive officers, and the ratification of Ernst & Young LLP as Quidel's independent registered public accounting firm for the fiscal year ending December 31, 2022.

104. The 2022 Proxy stated that Quidel "has adopted a Code of Business Conduct and Ethics that applies to all its officers, directors and employees."

105. As to risk management, the 2022 Proxy stated:

> Quidel takes a comprehensive approach to risk management. Quidel believes risk can arise in every decision and action taken, whether strategic or operational. Quidel, therefore, seeks to include risk management principles in all of its management processes and in the responsibilities of its employees at every level. Quidel's comprehensive approach is reflected in the reporting processes by which its management provides timely and comprehensive information to the Quidel board of directors to support the Quidel board of directors' role in oversight, approval and decision-making.

106. The 2023 Proxy recommended that shareholders vote to elect Defendants Bryant, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and

Wise to serve until the 2024 annual meeting of stockholders. It also recommended that shareholders vote to ratify Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2023, and to approve, on an advisory basis, the compensation of the Company's named executive officers.

107. The 2024 Proxy recommended that shareholders vote to elect Defendants Buechler, Dilsaver, Michael, Polan, Prutow, Rhoads, Schmidt, Strobeck, Widder, and Wilkins to serve until the 2025 annual meeting of stockholders. It also recommended that shareholders vote to ratify Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 29, 2024, and to approve, on an advisory basis, the compensation of the Company's named executive officers.

108. The 2023 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> We take a comprehensive approach to risk management. We believe risk can arise in every decision and action taken by the Company, whether strategic or operational. We, therefore, seek to include risk management principles in all of our management processes and in the responsibilities of our employees at every level. Our comprehensive approach is reflected in the reporting processes by which our management provides timely and comprehensive information to the Board to support the Board's role in oversight, approval and decision-making.
>
> The Board evaluates the information it receives from management and provides oversight and guidance to our management team concerning the assessment and management of risk. The Board approves the Company's high-level operating objectives, goals, strategies and policies to set the tone and direction for appropriate risk taking within the business. The Board and its committees then emphasize this tone and direction in their oversight of management's implementation of the Company's operating objectives, goals, strategies and policies.
>
> Our senior executives provide the Board and its committees with regular updates about the Company's strategies and objectives and

> the risks inherent within them at Board and committee meetings and in regular reports. Board and committee meetings also provide a venue for directors to discuss issues with management. The Board and its committees call special meetings when necessary to address specific issues or take specific actions. In addition, our directors have access to Company management at all levels to discuss any matters of interest, including those related to risk. Those members of management most knowledgeable about the issues often attend Board meetings to provide additional insight into items being discussed, including risk exposures.
>
> The Board has delegated oversight of matters involving certain specific areas of risk exposure to, and within the purview of, each of its four standing committees. Each committee generally reports to the Board at regularly scheduled Board meetings, and more frequently if appropriate, with respect to matters and risks for which such committee provides oversight. The specific responsibilities of each of the Board committees are more fully described below in the "—Audit Committee," "—Compensation Committee," "—Nominating and Governance Committee" and "—Science and Technology Committee" sections.

109. The 2023 Proxy stated the following regarding the Company's Code of Business Conduct and Ethics:

> We have adopted a Code of Business Conduct and Ethics that applies to all of our officers, directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. If we make any amendments or grant any waivers, including any implicit waivers, to our principal executive, financial or accounting officers (or persons performing similar functions), we intend to disclose the nature of such amendment or waiver on our website at *www.quidelortho.com* or in a Current Report on Form 8-K to the extent required by applicable rules and regulations.

110. The 2024 Proxy contained similar provisions to the 2023 Proxy regarding the Board's role in risk oversight and the Company's Code of Business Conduct and Ethics.

111. Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins (as to the 2022 Proxy); Defendants Bryant, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise (as to the 2023 Proxy); and Defendants

Buechler, Dilsaver, Michael, Polan, Prutow, Rhoads, Schmidt, Strobeck, Widder, and Wilkins (as to the 2024 Proxy) caused the Proxies to be false and misleading by failing to disclose that: (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the Proxies claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences.

112. Furthermore, the Defendants identified in the preceding paragraph, as to the respective Proxies identified therein, caused the Proxies to be false and misleading and failed to disclose material facts necessary to make the statements therein not false and misleading. Specifically, the Proxies failed to disclose, *inter alia*, that: (i) the Savanna RVP4 Test suffered from fundamental design and manufacturing flaws and could not meet FDA requirements; (ii) the Company could not manufacture the Savanna RVP4 Test at scale; (iii) the Company's COVID-19 tests were losing market share, its Sofia platform faced end-of-life concerns, sales quotas were being missed, and excess and obsolete inventory was mounting; (iv) as a result, there was no reasonable basis for the Company's endemic COVID-19 revenue guidance or for its representations about the Savanna RVP4 Test's commercial launch in the United States; and (v) as a result of (i) – (iv) above, the Individual Defendants lacked a reasonable basis for their positive statements about QuidelOrtho's business, financials, and growth trajectory.

113. As a result of the Company's false and misleading statements in the Proxies, the Company's stockholders made uninformed decisions when voting to elect or reelect the director nominees proposed in the Proxies.

114. The Individual Defendants made materially false and misleading statements designed to mislead the investing public. The Individual Defendants knew or deliberately disregarded and failed to disclose the following adverse facts about QuidelOrtho's business, operations, and prospects: (i) that the Savanna RVP4 Test suffered from fundamental design and manufacturing flaws, failed in the field in Europe at alarming rates, and generated widespread customer complaints; (ii) that the Company could not manufacture the Savanna RVP4 Test at scale, having failed to bring an automated production line online despite investing at least $100 million; (iii) that the Company's distributors held excess, expiring inventories of COVID-19 tests and had stopped or were poised to stop ordering COVID-19 tests from the Company; (iv) that undisclosed problems, including that the Savanna RVP4 Test fell short of the sensitivity required for FDA clearance, created a heightened risk that the Savanna RVP4 Test would experience a delayed commercial launch in the United States; (v) that the Company's Sofia platform faced end-of-life concerns, the Company was losing market share to competitors, COVID-19 sales quotas were missed throughout 2023, and excess and obsolete inventory was mounting, such that there was no path to achieving $200 million to $400 million in annual endemic COVID-19 revenue after 2023; and (vi) that, as a result of (i) – (v) above, the Individual Defendants lacked a reasonable basis for their positive statements about QuidelOrtho's business, financials, and growth trajectory.

**The Truth Emerges**

115. The truth behind the Individual Defendants' fraud began to emerge on February 13, 2024, when QuidelOrtho released its financial results for its fourth fiscal quarter ended December 31, 2023 which fell far below its publicly issued projections. Among other things, the Company's Adjusted EPS was **46 percent below** the midpoint of Wall Street analysts' expectations, which was largely attributed to lower endemic COVID-19 revenues during the quarter from distributor

destocking. The Company also reported Adjusted EBITDA[3] of $195.4 million, 28 percent below analysts' consensus of $271 million. The Company also slashed its 2024 financial forecasts, including a drastic cut to its COVID-19 revenue guidance. Specifically, QuidelOrtho lowered its endemic COVID-19 revenue forecast from the range of $200-$400 million to $200 million.

116. During an earnings call on the same day, Defendants were asked about the Company's lowered guidance:

> **Analyst Alexander Nowak**: So you provided an endemic respiratory rate for 2023, and you were very confident in it throughout the year and sales still came in below that. So before COVID, the respiratory business for Quidel stand-alone was roughly $150 million of sales. Now your endemic rate for 2024 as it said today is $460 million to $730 million. Now if you get this endemic rate wrong for 2024, there's a lot of downside. I guess the question is why do you think this new number is right?
>
> **Defendant Bryant**: Thanks for the question, Alex. We think we have a pretty good understanding of market size, and we think the number of tests starting with flu, between $40 million and $60 million makes the most sense. We haven't seen something as low as $40 million in a while. And we wouldn't expect at this stage to see something more than $60 million. So I think we've pegged the market size correct. The question is what's your market share? Well, our market share actually has increased in the recent report that we saw this morning that increased slightly more than that. Well, the other factor is what's happening with your price. Well, our price basically is flat. And we've been able to take share in place Sofia analyzers with that same price. We've also seen a shift towards the combo assay, which is super healthy. So obviously, very difficult to predict this market, which is why we're widening the range.

117. During the same call, Defendant Bryant continued to mislead investors. Specifically, he failed to disclose problems that created a heightened risk that the Savanna RVP4

[3] EBITDA is earnings before interest, taxes, depreciation, and amortization. Adjusted EBITDA removes one-time, irregular, and non-recurring items that distort EBITDA.

Test would experience a delayed commercial launch in the United States. For example, Defendant Bryant stated that:

> **The status of the submission of the 510(k) is on track** from my previous comments. Recall that I had said that we expect to get clearance before the end of the first quarter. I think we're still on track for all that.
>
> [. . .]
>
> Savanna has been a long time coming in the United States and our agenda at this point is clear, menu expansion and customer adoption. **We're advancing both with FDA review of our RVP4 panel and others in the queue. Our U.S. sales team is meeting this week, and I can assure you a successful Savanna commercial launch is on their menu as well.** As noted earlier, we will invest in the higher-growth immunohematology side of our Transfusion Medicine business.
>
> [. . .]
>
> Our guidance also assumes minimal contribution of between $30 million to $50 million in respiratory revenues from Savanna RVP4, and we expect that the revenue to be primarily in the fourth quarter of 2024, given the timing of approvals for the respiratory indication, which we expect in Q1. **We continue to expect Savanna instrument placements of approximately 1,000 in 2024, which will pave the way for 2025 Savanna revenue growth.**

118. In response to these poor results and weak guidance, multiple analysts immediately downgraded their ratings on QuidelOrtho stock and voiced their concerns. William Blair analyst Andrew Brackmann wrote that management needed to "rebuild some credibility" and Raymond James analyst Andrew Cooper took note of Defendants' "fairly deplorable communication and expectation setting both over the course of 2023 and even as recently as [January 2024]." Craig-Hallum analyst Alexander Nowak stated that "Q4 came in as one of the most surprising results we have seen in diagnostics in some time—and not in a pleasant way for shareholders." On this news,

the price of QuidelOrtho common stock declined $21.50, or more than 32%, to close at $45.27 on February 14, 2024.

119. On February 21, 2024, the Company announced that the Board had determined on February 14, 2024 to terminate Defendant Bryant as President and CEO, effective February 21, 2024, and that he had resigned from the Board effective February 21, 2024.

120. On March 4, 2024, UBS downgraded QuidelOrtho stock to Sell, reporting, based on its proprietary database, that "QDEL is seeing sharper declines in COVID revenues vs. PCR peers as DHR and HOLX," undercutting the Individual Defendants' attribution of the Company's poor 2023 results to market-wide declines in COVID-19 testing and indicating that the Company was losing COVID-19 market share to competitors. Competitors Danaher and Hologic had reported better-than-expected COVID-19 results for the fourth quarter of 2023. Following the UBS report, QuidelOrtho's stock fell from a close of $45.53 on March 1, 2024 to $44.33 on March 4, 2024, and fell an additional $1.39 to close at $42.94 on March 5, 2024.

121. On April 2, 2024, QuidelOrtho announced that it had withdrawn its FDA 510(k) submission for the Savanna RVP4 Test after recent data did not meet expectations. According to Citi analyst Patrick Donnelly, the Savanna RVP4 Test was "expected to be a key driver of Savanna uptake in the respiratory season." On this news, the price of QuidelOrtho stock dropped $4.85, or more than 10 percent, to close at $42.15 on April 2, 2024.

122. The fallout continued after the Relevant Period. On May 7, 2024, the Company announced the appointment of Brian Blaser as its new CEO, and the next day the Company again reduced its endemic COVID-19 revenue guidance, to $150 million, and reported that "Savanna revenue will be immaterial in 2024, with no expected US respiratory revenue contribution from Savanna in the 2024-2025 respiratory season." On July 31, 2024, the Company fired Bujarski and

Iskra. On November 7, 2024, the Company disclosed that it now anticipated the Savanna RVP4 Test entering the U.S. market "in the later part of 2025," with most of the "ramp-up" occurring in 2026 and 2027.

**<u>The Securities Class Action</u>**

123. On September 30, 2026, Judge Jeannette A. Vargas of the United States District Court for the Southern District of New York issued an Opinion and Order in the Securities Class Action granting in part and denying in part the defendants' motion to dismiss the amended class action complaint. MTD Order at 78.

124. The Court held that the class plaintiff adequately alleged that numerous statements concerning the Savanna RVP4 Test's FDA approval timeline, the Company's ability to manufacture Savanna at scale, and the Company's endemic COVID-19 revenue were materially false and misleading. *See* MTD Order at 46–49, 59–63, 64–65. Among other things, the Court credited allegations that the Savanna RVP4 Test "never came close" to the 95% sensitivity level required for FDA approval. *Id.* at 48. The Court further held that statements assuring investors that annual endemic COVID-19 revenue would remain within the $200 million to $400 million range beyond 2023 were material misrepresentations because, between missed sales quotas, impending end-of-life concerns for the Sofia line of products, Savanna RVP4's unviability, the Company's loss of market share, and skyrocketing excess and obsolete inventory, "there was no path to achieving revenue within the $200-400 million range after 2023." *Id.* at 64–65.

125. The Court rejected the defendants' reliance on the PSLRA safe harbor, holding that the cautionary language in the Company's SEC filings did not protect the challenged endemic COVID-19 revenue and market share projections because several of the risks it described, including market share loss and obsolescence, "had already manifested" by the time many of the filings were made, and because the class complaint is "replete with allegations" that Defendants

Bryant and Busky were aware that the Company's sales and inventory metrics rendered their revenue and market share projections "fantastical." MTD Order at 71.

126. The Court also held that the class plaintiff adequately alleged scienter as to both the individual defendants and the Company. MTD Order at 75. The Court considered allegations that C-suite bonuses were tied to Savanna launch targets; that the Executive Steering Committee for the Savanna project, which included Defendant Steward and was overseen by Defendant Bryant, pushed the Savanna RVP4 project through despite knowing it was flawed; that Defendants Bryant and Busky, among others, "knew facts or had access to information suggesting that their public statements were not accurate"; and that the announcement of Defendant Bryant's termination a week after the corrective market reaction was probative of recklessness. *Id*. at 74–75.

127. The Court further sustained the class plaintiff's scheme liability claim under Rule 10b-5(a) and (c), based on allegations including inflated sales goals, concealment of negative customer feedback in Europe, the dismantling and downsizing of the Savanna RVP4 team, the doubling of endemic COVID-19 revenue projections without substantiation, and the submission of the Savanna RVP4 Test to the FDA despite known insufficiencies. MTD Order at 76–77. Because the Section 10(b) claims survived, the Court held that the Section 20(a) control-person claims may proceed as well. *Id*. at 78.

128. As a result of the MTD Order, the Securities Class Action is proceeding against the Company and its current and former senior officers, and the Company remains exposed to substantial potential liability and the costs of defending that litigation.

## FIDUCIARY DUTIES

129. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe QuidelOrtho and its stockholders fiduciary

obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage QuidelOrtho in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of QuidelOrtho and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

130. Each Individual Defendant owes and continues to owe QuidelOrtho, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

131. The Individual Defendants, because of their positions of control and authority as directors and/or officers of QuidelOrtho, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with QuidelOrtho, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

132. To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a. Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational

information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b. Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States and pursuant to QuidelOrtho's own Code of Conduct;

c. Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

d. Remain informed as to how QuidelOrtho conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

e. Establish and maintain systematic and accurate records and reports of the business and internal affairs of QuidelOrtho, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

f. Maintain and implement an adequately functioning system of internal legal, financial, and management controls such that QuidelOrtho's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

g. Exercise reasonable control and supervision over the public statements made by the Company's officer and employees and any other reports of information that the Company was required by law to disseminate;

h. Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subject and duties set forth above; and

i. Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

133. The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by QuidelOrtho.

134. At all times relevant hereto, the Individual Defendants were the agents of each other and of QuidelOrtho and were at all times acting within the course and scope of such agency.

**<u>Duties Pursuant to the Company's Code of Business Conduct</u>**

135. The Individual Defendants, as officers and/or directors of QuidelOrtho, were bound by the Company's Code of Business Conduct and Ethics[4] (the "**Code of Conduct**") which provides:

> As we pursue our goals as a leading provider of diagnostic healthcare solutions world-wide, it is important that each employee complies with the Company's policies concerning ethics and business conduct when dealing with customers, suppliers, government agencies, stockholders, other collaborators and fellow employees. We enable our customers to optimize the long-term value for patients through our innovative solutions and services. We do that by reimagining what is possible, and by conducting our business with honesty, integrity, and the highest standards of business ethics. This Code of Business Conduct and Ethics summarizes our policies concerning the way we conduct business

[4] *See* QuidelOrtho Corporation's Code of Business Conduct and Ethics (May 27, 2022): https://s201.q4cdn.com/442754795/files/doc_governance/2022/09/QuidelOrtho-Corporation-Code-of-Business-Conduct-and-Ethics.pdf.

> and related employee responsibilities. All employees and members of the Company's Board of Directors must comply not only with the letter of this Code of Business Conduct and Ethics but also its spirit. We are privileged to work for such a dynamic company. It is the responsibility of all employees to ensure, by adhering to the policies contained herein, that we remain a place at which we can all be proud to work.

136. Under the "Introduction" section of the Code of Conduct, a subsection titled "Purpose" states the following:

> This [Code of Conduct] is the foundation of [the Company's] business practices. It contains general guidelines for conducting the business of the Company in a manner consistent with the highest standards of integrity, honesty, and business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.
>
> This Code applies to all directors, officers, employees and temporary workers of the Company and each of its subsidiaries. We refer to all officers and other personnel covered by this Code as "Company employees" or simply "employees," unless the context otherwise requires. In this Code, we refer to our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, as our "principal financial officers."

137. Under the "Introduction" section of the Code of Conduct, part of a subsection titled "General Guiding Principles" states the following:

> Obey all applicable laws and regulations. Compliance with applicable law is the starting point of our ethical behavior and is an absolutely essential part of our ethical responsibility. We conduct our business, and you are required to act, in accordance with all applicable laws and regulations.

138. Under the "Introduction" section of the Code of Conduct, a subsection titled "Policy Against Retaliation" states the following:

> The Company prohibits retaliation against an employee or director who, in good faith, seeks help or reports known or suspected violations. Any reprisal or retaliation against an employee because

> the employee, in good faith, sought help or filed a report will be subject to disciplinary action, including potential termination of employment.

139. Under the "Conflicts of Interest" section of the Code of Conduct, a subsection titled "Identifying Potential Conflicts of Interest" states the following:

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.
>
> Identifying potential conflicts of interest may not always be clear-cut. The following situations might reasonably be expected to give rise to a conflict of interest and should be identified to, and addressed by, the General Counsel or the Board of Directors:
>
> - Outside Employment. An employee or director being employed by, serving as a director of, or providing any services to a company or individual that the employee or director knows or suspects is a customer, supplier or competitor of the Company (other than services to be provided as part of an employee's job responsibilities for the Company). Similarly, an actual or apparent conflict of interest may arise if an employee serves as a personal fiduciary for another person, particularly if that relationship developed in the context of that employee's role with the Company.
>
> - Improper Personal Benefits. An employee or director obtaining any material (as to him or her) personal benefits or favors because of his or her position with the Company. Please see "Gifts and Entertainment" below for additional guidelines in this area.
>
> - Financial Interests. An employee or director having a "material interest" (ownership or otherwise) in any company that the employee or director knows or suspects is a material customer, supplier or competitor of the Company and using his or her position to influence a transaction with such company. Whether an employee or director has a "material interest" will be

determined by the Board of Directors in light of all of the circumstances, including consideration of the relationship of the employee or director to the customer, supplier or competitor, the relationship of the employee or director to the specific transaction and the importance of the interest to the employee or director having the interest.

- Loans or Other Financial Transactions. An employee or director obtaining loans or guarantees of personal obligations from, or entering into any other personal financial transaction with, any company or individual that the employee or director knows or suspects is a material customer, supplier or competitor of the Company. This guideline does not prohibit arms-length transactions with banks, brokerage firms or other financial institutions.

- Service on Boards and Committees. An employee or director serving on a board of directors or trustees or on a committee of any entity (whether profit or not-for-profit) whose interests reasonably would be expected to conflict with those of the Company.

- Actions of Family Members. The actions of family members of employees and directors outside the workplace may also give rise to the conflicts of interest described above because they may influence an employee's or director's objectivity in making decisions on behalf of the Company. For purposes of this Code, "family members" include your spouse or life-partner, brothers, sisters, parents, in-laws, children and grandchildren whether such relationships are by blood or adoption.

140. The "Corporate Opportunities" section of the Code of Conduct states the following in relevant part:

> As an employee or director of the Company, you have an obligation to advance the Company's interests when the opportunity to do so arises. If you discover or are presented with a business opportunity through the use of corporate property or information or because of your position with the Company, you should present the business opportunity to the Company. No employee or director may use corporate property, information or his or her position with the Company for personal gain or compete with the Company while employed or engaged by us.

141. The "Confidential Information" section of the Code of Conduct states the following in relevant part:

> Employees and directors have access to a variety of confidential information regarding the Company's business and those having a business relationship with it. Confidential information includes all non-public information that might be of use to the Company's competitors, or, if disclosed, harmful to the Company or its counter parties, business partners, customers (i.e., its advisory clients) or suppliers. Employees and directors have a duty to safeguard and not disclose all confidential information of the Company or third parties with which the Company conducts business, except when disclosure is authorized or legally mandated. Unauthorized disclosure of any confidential information is prohibited. In addition to the restrictions described above with respect to communicating confidential information outside the Company, employees and directors should take appropriate precautions to ensure that confidential or other sensitive information, whether it is proprietary to the Company or another company or individual, is not communicated within the Company except to employees and directors who have a need to know such information to perform their responsibilities for the Company. An employee's and director's obligation to protect confidential information continues after he or she leaves the Company. Unauthorized disclosure of confidential information could cause competitive harm to the Company or its customers and could result in legal liability to you and the Company.

142. The "Competition and Fair Dealing" section of the Code of Conduct states the following:

> All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

143. The "Gifts and Entertainment" section of the Code of Conduct states the following in relevant part:

> The giving and receiving of gifts can be a common business practice. Appropriate business gifts and entertainment are welcome courtesies designed to build relationships and understanding among business partners. Gifts and entertainment, however, should not compromise, or appear to compromise, your ability to make objective and fair business decisions. In addition, it is important to note that the giving and receiving of gifts are subject to a variety of laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering the marketing of products, bribery, and kickbacks. You are expected to understand and comply with all laws, rules and regulations that apply to activities you engage in when acting on the Company's behalf.
>
> It is your responsibility to use good judgment in this area. As a general rule, you may give or receive gifts or entertainment to or from external parties only if the gift or entertainment is infrequent, modest, intended to further legitimate business goals, in compliance with applicable law, providing the gift or entertainment would not be viewed as an inducement to or reward for any particular business decision, and the gift or entertainment otherwise complies with the Company's applicable policies and procedures regarding such gift or entertainment. All gifts and entertainment expenses should be properly accounted for on expense reports.
>
> You must be particularly careful that gifts and entertainment are not construed as bribes, kickbacks or other improper payments, particularly if you conduct business in countries outside of the United States. See the "Anti-Corruption Laws" section of this Code for a more detailed discussion of our policies regarding giving or receiving gifts related to business transactions in other countries.

144. The "Company Records" section of the Code of Conduct states the following in relevant part:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, clinical development, customer collaborations, manufacturing and

> regulatory submissions and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects.

145. The "Protection and Use of Company Assets" section of the Code of Conduct states the following:

> Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.
>
> Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to preserve and monitor electronic and telephonic communications. These communications may also be subject to disclosure to law enforcement or government officials.

146. The "Accuracy of Financial Reports and Other Public Communications" section of the Code of Conduct states the following in relevant part:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.
>
> The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and

> all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

147. The "Compliance With Laws and Regulations" section of the Code of Conduct states the following in relevant part:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

148. Under the "Compliance With Laws and Regulations" section of the Code of Conduct, a subsection titled "Interactions with the Government" states the following in relevant part:

> The Company may conduct business with the U.S. government, state and local governments and the governments of other countries. The Company is committed to conducting its business with all governments and their representatives with the highest standards of business ethics and in compliance with all applicable laws and regulations, including the special requirements that apply to communications with governmental bodies that may have regulatory authority over our products and operations, such as government contracts and government transactions.
>
> If your job responsibilities include interacting with the government, you are expected to understand and comply with the special laws, rules and regulations that apply to your job position as well as with any applicable standard operating procedures that the Company has implemented. If any doubt exists about whether a course of action is lawful, you should seek advice immediately from your supervisor or the Company's Legal and Compliance Department.
>
> In addition to the above, unless you are a member of the Government Affairs Department and are following the procedures established

> specifically for that department, you must obtain approval from the Company's Legal and Compliance Department for any work activity that requires communication with any member or employee of a legislative body or with any government official or employee. Work activities covered by this policy include meetings with legislators or members of their staffs or with senior executive branch officials on behalf of the Company for lobbying or advocacy purposes (but, for the avoidance of doubt, would not include the Regulatory Department's interactions with the U.S. Food and Drug Administration or similar regulators in countries outside the United States). Preparation, research and other background activities that are done in support of lobbying communication are also covered by this policy even if the communication ultimately is not made.

149. Under the "Compliance With Laws and Regulations" section of the Code of Conduct, a subsection titled "Political Contributions and Volunteer Activities" states the following in relevant part:

> The Company encourages its employees and directors to participate in the political process as individuals and on their own time. However, federal and state contribution and lobbying laws severely limit the contributions the Company can make to political parties or candidates. It is Company policy that Company funds or assets not be used to make a political contribution to any political party or candidate, unless prior approval has been given by our General Counsel. The Company will not reimburse you for personal political contributions. When you participate in non-Company political affairs, you should be careful to make it clear that your views and actions are your own, and not made on behalf of the Company.

150. Under the "Compliance With Laws and Regulations" section of the Code of Conduct, a subsection titled "Compliance with Antitrust Laws" states the following:

> Antitrust laws of the United States and other countries are designed to protect consumers and competitors against unfair business practices and to promote and preserve competition. Our policy is to compete vigorously and ethically while complying with all antitrust, monopoly, competition or cartel laws in all countries, states or localities in which the Company conducts business. Violations of antitrust laws may result in severe penalties against the Company and its employees, including potentially substantial fines and criminal sanctions. You are expected to maintain basic familiarity with the antitrust principles applicable to your activities, and you

> should consult the Company's Legal and Compliance Department with any questions you may have concerning compliance with these laws.
>
> a. Meetings with Competitors[:] Employees should exercise caution in meetings with competitors. Any meeting with a competitor may give rise to the appearance of impropriety. As a result, if you are going to meet with a competitor where there is a reasonable expectation that the meeting will involve discussions about Company business, you should obtain the prior approval of an executive officer of the Company. You should try to meet with competitors in a closely monitored, controlled environment for a limited period of time. You should create and circulate agendas in advance of any such meetings, and the contents of your meeting should be fully documented.
>
> b. Professional Organizations and Trade Associations[:] Employees should be cautious when attending meetings of professional organizations and trade associations at which competitors are present. Attending meetings of professional organizations and trade associations is both legal and proper, if such meetings have a legitimate business purpose and are conducted in an open fashion, adhering to a proper agenda. At such meetings, you should not discuss the restricted topics listed above, including the Company's pricing policies or other competitive terms or any other proprietary, competitively sensitive information.

151. Under the "Compliance with Laws and Regulations" section of the Code of Conduct, a subsection titled "Compliance with Insider Trading Laws" states the following in relevant part:

> Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well

> as disciplinary action by the Company, up to and including termination of employment.

152. [redacted]

[redacted] Defendant Buechler knew what the policy was regarding Insider Trading and ignored it, selling 8,081 shares of QuidelOrtho stock on February 17, 2023 at $90.26 per share, for proceeds of approximately $729,366, while in possession of MNPI. [redacted]

153. Under the "Compliance with Laws and Regulations" section of the Code of Conduct, a subsection titled "Compliance with Trade Control Laws" states the following in relevant part:

> The United States anti-boycott law prohibits certain actions to comply with or support an unsanctioned foreign country's boycott against a country friendly to the United States. The prohibited actions include refusing to do business in a certain country, furnishing information about a person in response to a boycott-related request, and implementing a letter of credit that contains a condition related to any of the prohibited actions. The Company is committed to compliance with U.S. antiboycott laws and related regulations.
>
> United States economic sanctions regulations prohibit U.S. persons, including financial institutions and their foreign branches and non-

> U.S. affiliates, from exporting financial services to certain foreign governments and their specially designated nationals named by the Office of Foreign Assets Control ("OFAC"). These regulations also require that assets of these governments and persons be frozen.

154. Under the "Public Communications and Regulation FD" section of the Code of Conduct, a subsection titled "Public Communications Generally" states the following in relevant part:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive information.
>
> The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others (the "Regulation FD Policy") and an External Communications Policy to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

155. Under the "Public Communications and Regulation FD" section of the Code of Conduct, a subsection titled "Compliance with Regulation FD" states the following in relevant part:

> In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or shareholders (where it is reasonably foreseeable that the shareholders will trade on the information), we must also disclose the information to the public.

156. The "Anti-Corruption Laws" section of the Code of Conduct states the following:

> Applicable anti-corruption laws, including the Foreign Corrupt Practices Act (the "FCPA") and, where applicable, the UK Bribery Act ("UKBA") and other local anti-corruption laws, prohibit the Company and its employees, directors and agents from offering, giving or promising money or any other item of value, directly or indirectly, with the intent to improperly secure business, retain business, or to influence any act or decision of any government official, political party, candidate for political office or official of a public international organization. Stated more concisely, Company employees, directors and agents are prohibited from giving or receiving bribes, kickbacks or other inducements in order to obtain an improper business advantage.
>
> This prohibition also extends to payments to a third party agent of the Company (an "intermediary") if there is reason to believe that the payment will be used indirectly for a prohibited payment to foreign officials. Indirect payments include any transfer of money or other item of value to another individual or organization where the person making the transfer knows or has reason to know that some or all of that transfer is for the benefit of an individual to whom direct payments are prohibited. The use of intermediaries for the payment of bribes, kickbacks or other inducements is expressly prohibited. Violation of an applicable anti-corruption law can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including termination of employment.

157. The "Environment, Society, Health and Safety" section of the Code of Conduct states the following in relevant part:

> The Company is committed to providing a safe and healthy working environment for its employees and to avoiding adverse impact and injury to the environment and the communities in which it does business. Company employees and directors must comply with all applicable environmental, health and safety laws, regulations and Company standards. It is your responsibility to understand and comply with the laws, regulations and policies that are relevant to your job. Failure to comply with environmental, health and safety laws and regulations can result in civil and criminal liability against you and the Company, as well as disciplinary action by the Company, up to and including termination of employment.

158. The "Product Quality and Safety" section of the Code of Conduct states the following:

> The Company is committed to providing quality products and services to our customers in compliance with applicable laws and regulations governing the development, manufacturing, labeling and approval of those products. We focus on understanding the requirements of our customers and providing products and services that meet or exceed their specifications and expectations. We design, manufacture and deliver products and services that fit their intended purpose and, as applicable, approved indication, and we take care to ensure we are aware of, and comply with, regulatory requirements related to the approval, labeling and sales and marketing of our products. This means we must always be certain we understand and follow all contract specifications and quality control procedures and complete all required inspection and testing operations properly. To fulfill our commitment to product quality and safety, we expect our suppliers to assure the quality and safety of goods and services they provide to us.

**Duties Pursuant to the Audit Committee Charter**

159. In addition to the duties set forth in the Code of Conduct, Defendants Dilsaver, Rhoads, Strobeck and Widder (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to QuidelOrtho under the QuidelOrtho Corporation Audit Committee Charter[5] (the "**Audit Committee Charter**"), as set forth in part below.

160. Specifically, the Audit Committee Charter noted that the purpose of the Audit Committee is to:

> [R]epresent and assist the Board in discharging its oversight responsibilities relating to the Company's accounting and financial reporting processes and the audits of the Company's financial statements.

[5] *See* QuidelOrtho Corporation Audit Committee Charter. (Amended February 9, 2024). https://s201.q4cdn.com/442754795/files/doc_downloads/governance/2024/QO-Audit-Committee-Charter-2-9-24-Final.pdf.

> The Committee also has responsibilities relating to: (i) surveillance of the design and functioning of internal accounting, financial and disclosure controls; (ii) review of the independent registered public accounting firm's qualifications and independence; (iii) oversight of the Company's internal audit function; (iv) monitoring and evaluating the performance of the independent registered public accounting firm; (v) overseeing the Company's compliance with legal and regulatory requirements; and (vi) reviewing, setting policy and evaluating the effectiveness of the Company's processes for assessing significant risk exposures and measures that management has taken to minimize such risks.
>
> The Committee shall provide the report required by the rules of the SEC to be included in the Company's annual proxy statement.

161. The "Authority" section of the Audit Committee Charter states the following:

> The Committee has full authority and unrestricted access to the resources, information and personnel necessary to achieve its mission and functions.
>
> The Committee has the power to conduct or authorize investigations into any matters within its scope of responsibilities.

162. The "Duties and Responsibilities" section of the Audit Committee Charter states:

> Among its specific duties and responsibilities, the Committee shall, consistent with, and subject to, applicable law and rules and regulations promulgated by the SEC, Nasdaq or other regulatory authority:
>
> 1. Appoint, retain, determine funding for, and, when appropriate, terminate the Company's independent registered public accounting firm, which firm shall report directly to the Committee. In its capacity as a committee of the Board, the Committee shall be directly responsible for the appointment, compensation and oversight of the independent registered public accounting firm, including the sole authority and responsibility to select, evaluate and if necessary replace the independent registered public accounting firm.
>
> 2. Review and approve in advance all audit services to be provided by the independent registered public accounting firm and establish policies and procedures with respect to permissible non-audit services to be provided by the independent registered

public accounting firm, which shall require pre-approval by the Committee for all such permissible non-audit services.

3. Provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

4. Periodically review, at least annually, the independence of the independent registered public accounting firm. In this regard, the Committee shall: (i) review and discuss with the independent registered public accounting firm the matters to be included in the written disclosures from the firm to the Committee required by professional independence standards applicable to the independent registered public accounting firm, including reviewing and discussing any relationship between the independent registered public accounting firm and the Company or any other relationships that may adversely affect the independence of the independent registered public accounting firm; (ii) actively engage in a dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the outside auditor; (iii) consider whether the independent registered public accounting firm’s performance of permissible non-audit services is compatible with the firm’s independence; and (iv) present to the Board the Committee’s conclusions with respect to the independence of the independent registered public accounting firm and take, or recommend that the full Board take, appropriate action to oversee the independence of the outside auditor.

5. Obtain and review, at least annually, a report by the independent registered public accounting firm describing: (i) the independent registered public accounting firm’s internal quality-control procedures; and (ii) any material issues raised by the most recent internal quality-control review, or peer review, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, relating to one or more independent audits carried out by the independent registered public accounting firm, and any steps taken to deal with any such issues.

6. Review and discuss with the independent registered public accounting firm: (i) the scope of their audit, the results of the audit and any accompanying management letters, and any difficulties they may have encountered in the course of their audit, including any restrictions on the scope of their activities

or on access to requested information, and any significant disagreements with management; and (ii) any of their reports with respect to interim periods.

7. Determine that the independent registered public accounting firm has a process in place to address rotation of the lead audit partner and other audit partners serving the account as required under SEC independence rules.

8. Establish policies and the parameters for the Company's hiring of employees and former employees of the independent registered public accounting firm.

9. Periodically review and discuss with the independent registered public accounting firm, management, the internal auditor and such others as the Committee deems appropriate, the adequacy and effectiveness of the Company's financial reporting processes and internal controls, the Company's report on internal control over financial reporting and the independent registered public accounting firm's attestation on internal control over financial reporting, including any significant changes in such controls or significant deficiencies or material weaknesses identified; and review and discuss with management or the principal internal auditor of the Company and such others as deemed appropriate, the scope and results of the Company's internal audit program.

10. Review and discuss with management and the independent registered public accounting firm the Company's annual and quarterly financial statements, and annual and quarterly reports on Forms 10-K and 10-Q, respectively, prior to filing with the SEC, including: (i) an analysis of the independent registered public accounting firm's judgment as to the quality of the Company's accounting principles; (ii) the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations;" (iii) the reasons for material variances of actual financial results from the annual budget as approved by the Board; and (iv) any certification, report, opinion or review rendered by the independent registered public accounting firm with respect to such reports. The Committee shall recommend to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K.

11. Review and discuss with management and the independent registered public accounting firm the accounting policies that

may be viewed as critical, including critical auditing matters communicated by the firm, and any significant changes in the accounting policies of the Company and accounting and financial reporting rule changes that may have a significant impact on the Company's financial reports.

12. Periodically review and discuss the adequacy of the Company's disclosure controls and procedures and management reports thereon.

13. Review and discuss generally the information to be disclosed and the presentation to be made in the Company's earnings and press releases involving results of operations, financial condition or forecasts.

14. Review and approve the Company's policy for the investment of liquid assets.

15. Review and discuss with management and the independent registered public accounting firm (i) any material financial or non-financial arrangements of the Company that do not appear on the financial statements of the Company; and (ii) any transactions or course of dealings with related parties that are significant in size or involve terms or other aspects that differ from those that would likely be negotiated with independent third parties and are relevant to an understanding of the Company's financial statements.

16. Review and discuss with management and the independent registered public accounting firm proposed and recently adopted accounting principles and standards and the potential impact to the Company.

17. Review and discuss the Company's policies and practices with respect to risk assessment and risk management, and oversee risks related to the Company's financial statements and financial reporting process, compliance and information technology and cybersecurity.

18. Oversee the Company's public reporting regarding environmental, social and governance ("ESG") matters, including disclosures related to climate change risk and the Company's greenhouse gas emissions, and discuss with management related risks, controls and procedures.

19. Review and approve, as appropriate, all related party transactions involving directors, executive officers and other related parties in accordance with the Company's Related Party Transaction Policy and Procedures.

20. Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's Code of Business Conduct and Ethics and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the General Counsel and the Vice President, Compliance, who shall each have the authority to communicate directly with the Audit Committee, promptly, about actual and alleged violations of law or the Company's Code of Business Conduct and Ethics, including any matters involving criminal or potential criminal conduct.

21. Review material, pending legal proceedings, and other contingent liabilities involving the Company.

22. Establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls and auditing matters, including procedures for confidential, anonymous submissions of complaints or concerns by employees regarding questionable accounting and auditing matters and review quarterly with management such processes and procedures.

23. Evaluate annually the performance of the Committee and review this Charter recommending any changes to the Board, accordingly.

24. Regularly report to the Board with respect to the Committee's meetings and activities.

25. Perform such other duties and responsibilities as assigned by law, the Company's charter, bylaws and the Board.

163. While the Audit Committee had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill these responsibilities. In fact, the

Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

**BREACHES OF DUTIES**

164. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of QuidelOrtho, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

165. The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the Savanna RVP4 Test and the Company's COVID-19 business as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices caused QuidelOrtho substantial damage. The Savanna RVP4 Test and the Company's FDA-regulated respiratory business were mission critical to QuidelOrtho, so the Board was required to make a good-faith effort to implement and monitor a reporting system for those risks. *See Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019).

166. The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee QuidelOrtho's public statements and internal control function.

167. The Individual Defendants, because of their positions of control and authority as officers and/or directors of QuidelOrtho, were able to and did, directly or indirectly, exercise

control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, QuidelOrtho has expended, and will continue to expend, significant sums of money.

## DAMAGES TO QUIDELORTHO

168. As a direct and proximate result of the Individual Defendants' conduct, QuidelOrtho has expended and will continue to expend significant sums of money.

169. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

170. As a direct result of the Individual Defendants' conduct, QuidelOrtho has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

171. Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

172. Plaintiff brings this action derivatively and for the benefit of QuidelOrtho to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of QuidelOrtho, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

173. QuidelOrtho is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

174. Plaintiff is, and has been continuously at all relevant times, a stockholder of QuidelOrtho. Plaintiff will adequately and fairly represent the interests of QuidelOrtho in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

175. Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

176. A pre-suit demand on the Board of QuidelOrtho is futile and, therefore, excused. At the time of filing this action, the Board consists of ten directors: Defendants (i) Buechler, (ii) Dilsaver, (iii) Michael, (iv) Polan, (v) Rhoads, (vi) Widder, and (vii) Wilkins (the "**Demand Defendants**"), and non-parties (viii) Brian Blaser, (ix) John Chiminski, and (x) R. Scott Huennekens. Demand is futile as to at least six of the ten directors on the Board when this action was commenced, so the Board cannot impartially consider a demand. *See United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

177. Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

178. Demand is excused as to all of the Demand Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts regarding the Savanna RVP4 Test and

the Company's COVID-19 business. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Demand Defendants breached their fiduciary duties, face a substantial likelihood of liability and are not disinterested. Demand upon them is futile and thus excused.

179. Moreover, the Demand Defendants signed the 2022 10-K, and most of them also signed the 2021 10-K, each of which omitted the material adverse facts alleged herein and contained cautionary risk disclosures warning of risks, such as market share loss and obsolescence, that had already materialized. Accordingly, those Demand Defendants made the false and misleading statements contained in those financial statements, breached their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon all the Demand Defendants is futile and therefore excused.

180. Further, the Demand Defendants who then served on the Board solicited the 2024 Proxy. The 2024 Proxy was false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

**The Board Faces a Substantial Likelihood of Liability**

181. Demand is excused as to all the Demand Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability. In complete abdication of their fiduciary duties, the Demand Defendants either knowingly or recklessly participated in making and/or causing the Company to make materially false and misleading statements regarding the Savanna RVP4 Test and the Company's COVID-19 business. Specifically, the Demand Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospects from the investing public and supporting the artificially inflated price of QuidelOrtho's securities. The

fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Demand Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile, and thus excused.

182. Specifically, the 2021 10-K was signed by Defendants Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins. The 2022 10-K was signed by Defendants Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Strobeck, Widder, and Wilkins. Both of these filings omitted the material adverse facts alleged herein, and their risk disclosures warned of risks that had already materialized. Accordingly, the Demand Defendants who signed them approved materially incomplete filings, breached their fiduciary duties and face a substantial likelihood of liability. Thus, demand upon those Demand Defendants is futile and therefore excused.

183. The Demand Defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

184. Additionally, the Demand Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

185. Each of the Demand Defendants: 1) authorized, signed, and/or permitted the false and misleading statements described herein to be disseminated directly to the public and made available and distributed to shareholders; 2) authorized and/or permitted the issuance of various false and misleading statements; and 3) are principal beneficiaries of the wrongdoing alleged

herein. Thus, the Demand Defendants could not fairly and fully prosecute such a suit even if they instituted it.

186. The Demand Defendants, as members of the Board, were and are subject to QuidelOrtho's Code of Conduct. The Demand Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Demand Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

**Additional Demand Futility Allegations**

187. Demand is further excused as to Defendant Buechler. Defendant Buechler has served as a Company director since 2007. The Company provides Defendant Buechler with significant compensation for his role as stated above. As such, Defendant Buechler cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Buechler render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. Defendant Buechler also engaged in insider trading, selling 8,081 shares of artificially inflated Company common stock on February 17, 2023 at $90.26 per share, for proceeds of approximately $729,366. As a result, Defendant Buechler breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Buechler is futile and excused.

188. Demand is further excused as to Defendant Dilsaver. Defendant Dilsaver has served as a Company director since 2022. The Company provides Defendant Dilsaver with significant compensation for her role as a director as stated above. As such, Defendant Dilsaver cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Dilsaver render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, she also consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Dilsaver breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Dilsaver is futile and excused.

189. Demand is further excused as to Defendant Michael. Defendant Michael has served as a Company director since 2018. The Company provides Defendant Michael with significant compensation for his role as stated above. As such, Defendant Michael cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Michael render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Michael breached his fiduciary duties, faces a substantial likelihood of liability, and is

neither independent nor disinterested. Thus, demand upon Defendant Michael is futile and excused.

190. Demand is further excused as to Defendant Polan. Defendant Polan has served as a Company director since 1993. The Company provides Defendant Polan with significant compensation for her role as a director as stated above. As such, Defendant Polan cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Polan render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, she also consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Polan breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Polan is futile and excused.

191. Demand is further excused as to Defendant Rhoads. Defendant Rhoads has served as a Company director since 2020. The Company provides Defendant Rhoads with significant compensation for her role as a director as stated above. As such, Defendant Rhoads cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Rhoads render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, she conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements, thus consciously disregarding her duties to protect corporate assets. As

a result, Defendant Rhoads breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Rhoads is futile and excused.

192. Demand is further excused as to Defendant Widder. Defendant Widder has served as a Company director since 2014. The Company provides Defendant Widder with significant compensation for his role as a director as stated above. As such, Defendant Widder cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Widder render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, he conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements, thus consciously disregarding his duties to protect corporate assets. As a result, Defendant Widder breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Widder is futile and excused.

193. Demand is further excused as to Defendant Wilkins. Defendant Wilkins has served as a Company director since 2021. The Company provides Defendant Wilkins with significant compensation for his role as a director as stated above. As such, Defendant Wilkins cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Wilkins render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, he conducted little, if any, oversight to prevent the scheme that caused the Company to make false

and misleading statements, thus consciously disregarding his duties to protect corporate assets. As a result, Defendant Wilkins breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Wilkins is futile and excused.

194. Furthermore, Defendants Dilsaver, Rhoads, and Widder have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of QuidelOrtho's financial statements. Specifically, the Audit Committee Charter provides that the Audit Committee is responsible for:

> [R]epresent[ing] and assist[ing] the Board in discharging its oversight responsibilities relating to the Company's accounting and financial reporting processes and the audits of the Company's financial statements.
>
> The Committee also has responsibilities relating to: (i) surveillance of the design and functioning of internal accounting, financial and disclosure controls; (ii) review of the independent registered public accounting firm's qualifications and independence; (iii) oversight of the Company's internal audit function; (iv) monitoring and evaluating the performance of the independent registered public accounting firm; (v) overseeing the Company's compliance with legal and regulatory requirements; and (vi) reviewing, setting policy and evaluating the effectiveness of the Company's processes for assessing significant risk exposures and measures that management has taken to minimize such risks.
>
> The Committee shall provide the report required by the rules of the SEC to be included in the Company's annual proxy statement.

195. In their capacities as Audit Committee members, Defendants Dilsaver, Rhoads, and Widder reviewed and approved the materially misleading statements and allowed them to be disseminated in QuidelOrtho's SEC filings and other disclosures. Thus, Defendants Dilsaver, Rhoads, and Widder breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason. Defendant Strobeck, who also served on the Audit Committee

during the Relevant Period, breached the same duties for the reasons alleged herein; he is not a Demand Defendant because he no longer serves on the Board.

## FIRST CLAIM

### Against Defendants Buechler, Dilsaver, Michael, Polan, Prutow, Rhoads, Schmidt, Strobeck, Widder, and Wilkins

*for Violations of Section 14(a) of the Exchange Act*

196. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

198. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

199. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

200. In the exercise of reasonable care, the Individual Defendants Buechler, Dilsaver, Michael, Polan, Prutow, Rhoads, Schmidt, Strobeck, Widder, and Wilkins should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2024 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

201. The false and misleading elements of the 2024 Proxy led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to QuidelOrtho.

202. With respect to the 2024 Proxy, the Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy.

203. Plaintiff, on behalf of QuidelOrtho, has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Bryant and Busky**

*for Violations of Section 20(a) of the Exchange Act*

204. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205. Defendants Bryant and Busky, by virtue of their positions with QuidelOrtho and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of QuidelOrtho and officers and directors who made the false and misleading statements alleged

herein within the meaning of § 20(a) of the Exchange Act. Defendants Bryant and Busky had the power and influence, and exercised same, to cause QuidelOrtho to engage in the illegal conduct and practices complained of herein.

206. Plaintiff, on behalf of QuidelOrtho, has no adequate remedy at law.

**THIRD CLAIM**

**Against the Individual Defendants**

*for Breach of Fiduciary Duties*

207. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of QuidelOrtho's business and affairs as directors and/or officers of the Company.

209. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

210. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly and recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

211. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

212. The Individual Defendants engaged in a sustained and systemic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, QuidelOrtho has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities litigation, severe damage to the share price of the Company's stock, and an increased cost of capital. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214. Plaintiff, on behalf of QuidelOrtho, has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants**

*for Unjust Enrichment*

215. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of QuidelOrtho.

217. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from QuidelOrtho tied to the performance or artificially inflated valuation of QuidelOrtho, or received compensation that was unjust in light of their bad faith conduct. In addition, Defendant Buechler sold 8,081 shares of QuidelOrtho stock at an artificially inflated price of $90.26 per share on February 17, 2023.

218. Plaintiff, as a stockholder and a representative of QuidelOrtho, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

219. Plaintiff, on behalf of QuidelOrtho, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of QuidelOrtho, and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached their fiduciary duties to QuidelOrtho;

C. Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

D. Finding that the Individual Defendants have been unjustly enriched;

E. Determining and awarding to QuidelOrtho the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

F. Directing QuidelOrtho and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect QuidelOrtho and its stockholders from a repeat of the damaging events described herein;

G. Awarding QuidelOrtho restitution from Individual Defendants;

H. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2026

**LEVI & KORSINSKY, LLP**

__________________________

Gregory M. Nespole
Daniel Tepper
Correy A. Suk
33 Whitehall Street, 27th Floor
New York, New York 10004
Phone: (212) 363-7500
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

**KUEHN LAW, PLLC**
Justin A. Kuehn
53 Hill Street, Suite 605
Southampton, New York 11968
Phone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*